STATE OF VERMONT

SUPERIOR COURT
Vermont Unit

| | |
|---|---|
| In re Costco Stormwater Discharge Permit Application (Permit No. 4114-9015.2) | Docket No. 75-6-12 Vtec |
| In re Costco Final Plat & Site Plan Amendment Application | Docket No. 104-8-12 Vtec |
| In re Wetlands Reclassification Petition | Docket No. 132-10-13 Vtec |
| In re Costco Act 250 Land Use Permit Amendment Application | Docket No. 41-4-13 Vtec |
| In re Costco Individual Wetlands Permit (Permit No. #2013-189) | Docket No. 59-5-14 Vtec |

**Decision on the Merits**

Costco Wholesale Corporation ("Costco") owns property between Hercules Drive and Lower Mountain View Drive in the Town of Colchester, Vermont on which it currently operates a members-only discount retail store.[1]  The Costco facility is a short distance from the junction of Interstate 89 ("I-89") and Vermont Routes 2 and 7 and presently contributes traffic to that often busy and congested intersection.  There are wetlands on or adjoining the Costco property, including a wetland that was recently reclassified from a Class III (and therefore unprotected) wetland to a Class II (and therefore protected) wetland.  Stormwater generated on or that travels through the Costco property currently travels through one or more of these wetlands, including the recently reclassified wetland.

The above-docketed appeals concern Costco's plans to expand the facility in Colchester, add motor vehicle gasoline sales facilities, reconfigure a portion of its parking lots, especially in

---

[1] This Costco property was originally developed in 1992, according to trial testimony.  Costco has similar and larger stores throughout the United States.

the area of its proposed gasoline sales facilities, and realign and expand upon its stormwater treatment structures. Two commercial neighbors—R.L. Vallee, Inc. ("Vallee"), owner and operator of the nearby Maplefields Convenience Store & gasoline station, and Timberlake Associates, LLP ("Timberlake"), owner and operator of the nearby Shell/Cumberland Farms Convenience Store & gasoline station—appealed all applicable local and state permit determinations issued in favor of Costco's proposed expansion plans. Some of those appeals were resolved through negotiations, for which the Court is very grateful to the parties and their attorneys.[2] When all other settlement opportunities proved unsuccessful, the Court scheduled the remaining appeals for a coordinated trial.

The trial was preceded by a site visit that occurred on June 17, 2014. No testimony or other evidence was received during the site visit; the purpose of the site visit was merely to provide context for the evidence that was to be received at trial. The Court found the context provided by the site visit to be very helpful in its deliberations.

The trial began immediately after the site visit and continued for a total of ten business days, with the trial being completed on July 2, 2014. The parties were thereafter afforded opportunities to submit post-trial memoranda and proposed Findings of Fact and Conclusions of Law. The final post-trial filings were submitted on September 16, 2014, when this matter was thereafter placed under advisement. Due to other commitments and administrative matters, the Court delayed the research, deliberation, and drafting required to complete this Merits Decision, for which the Court offers apologies to the parties and their counsel.

Throughout these proceedings, Costco has been represented by its attorney, Mark G. Hall, Esq.; Appellant R.L. Vallee has been represented by Jon T. Anderson, Esq. and Alexander J.

---

[2] Prior to trial, the parties resolved the following seven appeals concerning various proposed Costco expansion plans through settlement or stipulations for dismissal: (1) In re Costco & Lake Champlain Trans Corp Wetlands Determination, No. 24-2-12 Vtec (concerning an appeal from an earlier ANR wetland conditional use determination); (2) In re Costco Preliminary Plat Application, Docket No. 13-1-12 Vtec (concerning an appeal from a Colchester DRB preliminary plat determination); (3) In re Costco Stormwater Construction Permit, Docket No. 181-12-11 Vtec (concerning an appeal from an ANR stormwater permit determination); (4) In re Costco Act 250 Land Use Permit, Docket #143-7-09 Vtec (concerning an appeal from an Act 250 District Commission determination on a limited state land use application); (5) In re Costco Final Plat Application, Docket #113-6-09 Vtec (concerning an appeal from an earlier Colchester DRB final plat determination); (6) In re Costco Stormwater Permit (#414-9015.1), Docket No. 60-4-09 Vtec (concerning an appeal from an earlier ANR stormwater permit determination); and (7) In re Costco PUD/Preliminary Plat Application (Appeal of R.L. Vallee), Docket #21-2-09 Vtec (concerning an appeal from a Colchester DRB PUD determination on an earlier municipal permit application).

LaRosa, Esq.; Appellant Timberlake has been represented by David Grayck, Esq.; the Vermont Agency of Natural Resources ("ANR") has been represented by Elizabeth F. Lord, Esq. and Leslie A. Welts, Esq.; and the Vermont Natural Resource Board ("NRB") has been represented by Melanie Kehne, Esq. and Gregory J. Boulbol, Esq. Claudine C. Safar, Esq., initially appeared for the Town of Colchester ("Town"), but the Town later determined that it did not intend to play an active role in this litigation, so Attorney Safar moved to withdraw her representation, which the Court granted.

**Procedural History**

In 2007 Costco presented a plan to make certain improvements to its Colchester facility that included an expansion of its store and the addition of gasoline sales facilities. Facing opposition from nearby gas station owners, Costco revised its proposed plans and permit applications to only include the building and parking lot expansions and stormwater treatment upgrades. When Timberlake and R.L. Vallee appealed the permit approvals Costco received from ANR and the applicable State and municipal panels, Costco again revised its proposed plans, submitting new permit applications in 2011 and 2012 that included the gasoline sales facilities. The pending appeals all relate to these most recent revised permit applications.

At time of trial, the remaining appeals concerning the Costco improvements included:

a. In re Costco Stormwater Discharge (Permit No. 4114-9015.2), Docket No. 75-6-12 Vtec, which is an appeal of the ANR approval of Costco's stormwater discharge plans for the improved project site. R.L. Vallee filed the initial appeal and Timberlake filed the only cross-appeal. We hereinafter reference this appeal as the "Stormwater Discharge Appeal."

b. In re Costco Final Plat & Site Plan Amendment Application, Docket No. 104-8-12 Vtec, which is an appeal of the Town of Colchester Development Review Board ("DRB") approval of Costco's revised final plat and site plan amendment application. R.L. Vallee filed the only appeal in this proceeding. We hereinafter reference this appeal as the "Final Plat & Site Plan Amendment Appeal."

c. In re Costco Act 250 Land Use Permit Amendment Application, Docket No. 41-4-13 Vtec, which is an appeal from the Permit, Findings of Fact, Conclusions of Law, and Order issued by the District # 4 Environmental Commission ("District Commission"). Timberlake filed the initial appeal and R.L. Vallee filed the only cross-appeal. We hereinafter reference this appeal as the "Act 250 Appeal."

d. In re Wetlands Reclassification Petition, Docket No. 132-10-13 Vtec, which is an appeal of the ANR determination to reclassify what was identified at trial as the

"Lot 5 wetland" from a Class III wetland to a Class II wetland. This determination was based upon the reclassification petition filed by Timberlake; the appeal was filed by Costco. On the last day of trial (July 2, 2014, the tenth trial day), Costco advised that it no longer wished to dispute the reclassification of the Lot 5 wetland, but that it wished to maintain its attack upon ANR's conclusion that a fifty-foot buffer was necessary to protect the wetland's identified important functions and values.[3] We hereinafter reference this appeal as the "Wetlands Reclassification Appeal."

e. In re Costco Individual Wetlands Permit (Permit No. #2013-189), Docket No. 59-5-14 Vtec, which is an appeal of the ANR determination that approved Costco's plans build and operate a portion of its gasoline sales facility within the 50-foot buffer of the Lot 5 Class II wetland. R.L. Vallee filed the initial appeal and Timberlake filed the only cross-appeal. We hereinafter reference this appeal as the "Wetland Permit Appeal."

Also during the course of the trial, Timberlake advised that it wished to remain as an Interested Person in all the appeals that remained open, but that it no longer wished to pursue its independent appeals. The Court granted Timberlake's request and changed its status to Interested Party only and noted the dismissal of its independent appeals.

**Findings of Fact**

Based upon the credible evidence admitted at trial, including that which was put into context by the site visit, we do hereby issue the following Findings of Fact, Conclusions of Law, and the Judgment Order that accompanies this Merits Decision.

**I. General Background**

1. Costco's Colchester facility is part of a commercial planned unit development ("Commercial PUD") that was first proposed, approved, and developed thirty or more years ago and encompasses lands enclosed by the junctions of Routes 2 & 7 (a/k/a the Roosevelt Highway ("Highway")), Hercules Drive, and Lower Mountain View Drive, with additional Commercial PUD development further along Hercules Drive. See Costco Exhibit 4(D). This Commercial PUD presently includes, among other commercial and industrial developments, a hotel, the R.L.

---

[3] This legal issue overlaps with one in the Wetland Permit Appeal: whether Costco's plan to have a portion of its proposed gasoline sales facility located within some of the wetland's fifty-foot buffer will impact that wetland's identified important functions and values in more than a minimal way. We address these legal issues and the distinction between them in the Conclusions of Law section, below.

Vallee convenience store and gas station, a credit union, a bowling alley, and several restaurants.

2. Appellant Timberlake's convenience store and gas station is not part of this Commercial PUD. The existing Timberlake facilities are located to the south of the I-89/Exit 16 intersections on Roosevelt Highway, some undefined distance south of the Costco property.

3. The Costco property lies generally in the middle of the Commercial PUD. The eastern border runs along Hercules Drive. The property is partially bounded to the northwest by Lower Mountain View Drive, which provides access to the Costco parking lots. Also to the northwest of the Costco property lies an undeveloped parcel, identified as Lot 5, that is now or was formerly owned by the Lake Champlain Transportation Company. The property is bordered to the west by I-89 and to the north by another developed property.

4. Costco intends to acquire the undeveloped Lot 5 to support its proposed future development. See Costco Exhibit 4(B) (Boundary Adjustment Plat). For this reason, the Lake Champlain Transportation Company has been listed as a co-applicant on some of Costco's pending or past applications.

5. The existing Costco property occupies what was once identified as Lots 27 through 31 of the Commercial PUD. See Costco Exhibit 4(B). That combined parcel contains 10.7± acres. Id.

6. Costco initially received a State Land Use (Act 250) permit for its facility on July 24, 1998; a copy of its original Act 250 permit (Permit #4C0288) was admitted into evidence at trial as Exhibit 7(A). The existing development includes a 125,748 square foot members-only discount retail store and adjacent parking areas for 632 vehicles.

7. The existing Costco development is accessed primarily from Lower Mountain View Drive, which terminates as it enters the Costco development from the northwest, but is also accessed from two points along Hercules Drive, one of which is located northeast of the Costco building and another located southeast of the Costco building.

8. Both Lower Mountain View Drive and Hercules Drive provide access to the Costco development from the Roosevelt Highway, which is located to the northwest of the development and runs north/south, perpendicular to that section of I-89. Lower Mountain View Drive intersects with the Roosevelt Highway approximately 300 feet north of the junction

between the Highway and I-89 and generally provides the greater flow of traffic into and out of the Costco development. Hercules Drive intersects with the Roosevelt Highway farther north and provides better access to Costco visitors who are coming from or leaving for locations north of the I-89/Roosevelt Highway junction.

9. The Roosevelt Highway, particularly in the vicinity of this Commercial PUD, experiences regular heavy traffic congestion and backups. The Highway provides a frequently-used access to I-89 and is one of the main travel resources for this area of Colchester, the Town of Winooski and surrounding areas to the south, and the Town of Milton and surrounding areas to the north.

10. Costco and the other Commercial PUD developments are not the only source of traffic that causes congestion on the Highway. There are numerous other developments along the Highway, commercial and non, located north, south, east, and west of the Highway junction with I-89/Exit 16.

11. During the afternoon weekday rush hour, area traffic is particularly congested at the I-89/Roosevelt Highway junction.[4] Traffic attempting to turn left from the Roosevelt Highway onto the I-89 Southbound entrance ramp will sometimes back up to and past the intersection with Lower Mountain View Drive, thereby causing delays in traffic attempting to leave Upper and Lower Mountain View Drives.

12. These traffic delays and congestions are so significant as to encourage Town officials and others to attempt to convince the Vermont Agency of Transportation ("VTrans") to propose highway improvements to ease traffic congestion in the area. Some of these efforts predate Costco's announcement of its expansion plans.

13. VTrans is pursuing the necessary permits to accomplish proposed intersection and highway corridor improvements, particularly at the I-89 Exit 16 junction with the Roosevelt Highway.

---

[4] Busiest traffic times at highway intersections are referred to as "peak hours," a term explained in more detail below. Credible evidence revealed that 199 of the 200 highest peak hours of traffic within a given year of collected data for this intersection (i.e.: Roosevelt Highway intersections with I-89/Exit 16) were during weekday hours between 4:30 and 5:30 PM. Exhibit 3(a) at Attachment E (2013 Background Traffic Conditions Worksheets).

14.    Both Appellants operate convenience store/gas station facilities in the vicinity of the I-89 Exit 16 junction; both of their commercial operations contribute to and are sometimes negatively impacted by the area traffic.  In fact, even though R.L. Vallee has advocated for a condition in these proceedings that, should Costco receive its needed permits, would prohibit Costco from occupying or operating its proposed improvements until after all planned VTrans highway improvements are completed, R.L. Vallee has served as one of the principal objectors to the VTrans project permit application.

## II.  **Proposed Improvements**

### A.) **Building and fuel sales facilities improvements.**

15.    Costco proposes to expand its existing facility by building a 14,080 square foot addition to the full length of its eastern side, parallel to Hercules Drive.  See plan entitled "Overall Site Plan, Sheet SP1," admitted at trial as Costco Exhibit 4(E).  The proposed expansion will be merged with and used as part of the existing Costco store, resulting in an expanded facility with a total size of 139,828 square feet.  This expansion represents slightly more than an 11% increase to the existing building size.

16.    In order to accommodate the planned improvements and expansions, Costco proposes to acquire lands identified as Lot 5 in the Commercial PUD; Lot 5 lies to the northwest of Costco's existing developed lands.  See Costco Exhibit 4(B) (Boundary Adjustment Plat).  A large portion of Lot 5 contains wetlands and wet areas, including the wetland that was first classified as a Class III (i.e.: unprotected) wetland that is the subject of the Wetlands Reclassification Appeal.

17.    Costco also proposes to construct and operate a self-service gasoline sales facility near the boundary with Lot 5 and in an area now occupied by Costco's parking lot.  To accommodate the proposed gasoline sales facility, Costco will remove one portion and realign another portion of its existing parking lot.  See Costco Exhibit 4(G) (Demolition Plan, labeled as SP3).  The reconfigured parking lots will accommodate a total of 639 parking spaces; that is, an addition of seven spaces to those that exist for the permitted Costco facility.  See Costco Exhibit 3(A) at 11 (Applicant's Traffic Impact Study).

18.     The gasoline sales facility will consist of twelve gasoline dispensers located within three dispenser islands and a 72 square foot controller building.  Canopies will be installed above the dispenser islands to protect customers from the various weather elements.   Costco also proposes to realign its entrance from Lower Mountain View Drive, such that this access will enter the Costco parking area to the east of the new gasoline sales facilities, 25 feet east of its present location.  See Costco Exhibit 4(E).  As a result of this realignment, this access way will provide a more direct (rather than angled) access to the Costco parking areas, and will dissuade some non-shoppers from using the Costco parking lot as a pass-through between Lower Mountain View Drive and Hercules Drive.

**B.) <u>Highway/Traffic issues.</u>**

19.     Costco has offered to help pay for and/or construct certain roadway improvements and mitigation measures relative to their proportionate share of the impact upon traffic in the area.

20.     Costco and Appellants fiercely dispute the amount of additional traffic that the proposed improvements will cause and the impacts that this increase in traffic will have on the already congested roadways and intersections in the vicinity of the Costco property.

21.     Applicant retained an established transportation engineering and planning firm (Kittelson & Associates, Inc.), which provided credible assessments of the existing traffic conditions, an impact assessment of Costco's proposed improvements upon that traffic, and the impact of traffic mitigation plans proposed by Costco and VTrans.

22.     For context, we first note the existing traffic on area highways.  We then summarize what impacts are likely to come from the Costco improvements, particularly if no mitigation measure were completed, either by Costco or VTrans.  Lastly, we summarize what net traffic impacts can be expected from the proposed Costco improvements, after some or all of the proposed mitigation measures are completed.

23.     Highway intersections are graded based upon estimates of the "Level of Service" ("LOS") experienced by travelers at the examined intersections.  The LOS grade assigned to a highway intersection depends upon traffic congestion and the resulting delays in traffic travelling through that intersection.  An LOS "A" rating denotes that a highway intersection operates without delays; an LOS "F" denotes heavy and unacceptable traffic congestion.

24.     Accepted practices employed by traffic engineers, experts, and planners seek to identify traffic congestion during its heaviest times, which is sometimes designated as "peak hours" of traffic. The established theories recognize that to arrive at a true sense of a development's traffic impact and the possible responses to developmental impacts, consideration must be made of that development's estimated traffic impacts during some of those existing peak hours of nearby traffic. Traffic engineers, planners, and state and local officials have recognized the disadvantage of designing highway improvements based upon the highest peak hour of traffic use and have therefore arrived at a consensus that, when designing highway improvements, the 30th highest peak hour of traffic should be employed; this 30th highest peak hour of traffic is often referred to as the "design hour." See Costco Exhibit 3(A) at 80 for a summary of the reference materials relied upon by Applicant's traffic experts, including VTrans Guidelines, Synchro 7 modeling software, SIM Traffic modeling software, VISSIM modeling software, the 2000 Highway Capacity Manual, and various publications from the National Institute of Transportation Engineers.

25.     These software programs and reference materials are commonly relied upon by traffic experts. Applicant's traffic experts used these materials in manners accepted in their field of expertise; although Appellants questioned and offered criticism of Applicant's traffic experts and their techniques, we found that Applicant's expert presented the most credible explanation and examination of the current traffic challenges, how the proposed Costco improvements will impact on existing and future traffic, and to what extent the proposed mitigation steps will alleviate the overall traffic concerns.

26.     There are two principal means of analysis by which the future traffic from a proposed development are credibly estimated: (1) collection of existing traffic count data and (2) reference to established traffic estimation guides, including the National Institute of Transportation Engineers Trip Generation Manual. Applicant's traffic experts principally relied upon actual traffic data collected at area highway intersections by VTrans and the Chittenden County Metropolitan Planning Organization ("CCMPO"), a local regional organization that sought to address traffic congestion in the area, among other topics.

27.     Both VTrans and CCMPO collected actual traffic data at the applicable Roosevelt Highway intersections for several years prior to Applicant's Transportation Impact Study ("TIS"). See Costco Exhibits 3(A), (B), (C), and (D).  Applicant's traffic experts and their TIS were made more credible by the use of this actual traffic data, together with historical traffic data from similar Costco membership stores and their expansions, including expansions involving gasoline sales facilities.

### i.     *Existing traffic*

28.     Applicant's traffic experts examined existing and estimated future traffic at four highway intersections in the vicinity of the Costco development, all located along the Roosevelt Highway:  (a) at the intersection with the I-89/Exit 16 southbound ramps; (b) at the intersection with the I-89/Exit 16 northbound ramps; (c) at the intersection with Upper and Lower Mountain View Drives; and (d) at the intersection with Hercules Drive.  See Costco Exhibit 3(A) at 3 (Kittelson Transportation Impact Study, dated March 31, 2011).

29.     Applicant's traffic experts shared their initial traffic study with the Town, VTrans officials, and Appellants and their traffic expert.  After reviewing comments from Town officials and the traffic experts that the Town employed (Stantec Consulting Services, Inc.), Applicant's experts provided updates and explanations for their pre- and post-development traffic assessments.  See Exhibit 3(B) (dated June 15, 2011), Exhibit 3(C) (dated Sept. 28, 2011), and Exhibit 3(D) (dated Nov. 4, 2011).

30.     As of late 2011, and underlined without factoring for the proposed Costco improvements, the intersections at the Exit 16 Southbound and Northbound Ramps experienced a design hour volume ("DHV") of traffic that caused those intersections to be rated at an LOS D and E, respectively; the Highway intersection with Upper and Lower Mountain View Drive during the design hour experienced a LOS C rating; and the intersection with Hercules Drive for the same design hour experienced an LOS C rating.

31.     In particular, the DHVs reported show that the I-89/Exit 16 intersections are presently being called upon to handle traffic in excess of those intersections' design capacities and are in dire need of improvement, whether the proposed Costco improvements go forward or not.

32. With regards to the existing congestion on Roosevelt Highway, Applicant's experts credibly showed that traffic flow during the weekday peak hours was as high as 2,400 vehicles per hour south of the Lower Mountain View Drive intersection; weekday peak hour traffic north of Hercules Drive was as high as 1,495 vehicles. Exhibit 3(E) at 7.

33. Appellants noted that according to Applicant's expert's calculations, the highest peak hour flow of traffic from the existing Costco site occurs on Saturday at mid-day and not during the week. Applicant's experts credibly showed that the appropriate calculation of traffic impacts from the Costco improvements must reference the weekday peak hour volumes of all traffic, because that is when the existing flow of total Highway traffic is at its most congested (i.e.: not limited to only the traffic generated by Costco). We adopt this conclusion after comparing the above weekday peak hour traffic volumes with the Saturday peak hour volumes of total traffic: the mid-day Saturday peak hour volumes totaled 2,020 vehicles travelling south of Lower Mountain View Drive and 1,220 vehicles travelling north of Hercules Drive, as compared to the weekday traffic count data reported in Finding 32, above. These Saturday peak hour volumes represent 380 vehicles and 275 vehicles less (respectively) during the Saturday peak hour; each net weekend peak hour difference represents nearly double the total new one way vehicle trips estimated to be contributed by the Costco improvements. Id.

34. The flow of traffic from the Commercial PUD, including the existing Costco development, exacerbates the congestion experienced during the peak or design hours at these intersections: the majority of traffic flowing from the Commercial PUD developments travels northwesterly on Lower Mountain View Drive and attempts to turn left at the intersection with Roosevelt Highway, so as to enter the Exit 16 southbound or northbound ramps or to travel further south on the Highway towards Winooski.

35. At the most heavily travelled times (the 1st through 30th peak hours), traffic travelling south on Roosevelt Highway and attempting to turn left onto the Exit 16 southbound ramp backs up beyond the northbound ramp intersection and often times backs up beyond the Highway intersection with Lower Mountain View Drive. These traffic backups, when they occur, can also cause a backup of traffic exiting Lower Mountain View Drive, including traffic turning north or away from the I-89 intersections, such that the backed-up traffic can block the

entrance from Lower Mountain View Drive into Appellant R.L. Vallee's gas station and convenience store.

36.     Experts employed by Costco and the Town also relied upon historical traffic data collected by VTrans and CCMPO, as well as VTrans traffic accident data and accident ratings of various Roosevelt Highway intersections with other area roadways and commercial driveways. The VTrans data revealed that the location of most frequent traffic accidents in this area was the Highway intersection with Appellant Timberlake's gas station and convenience store and that the most frequent accidents at this location (i.e.: about 70%) involved "turning movements," including vehicles being involved in accidents that were turning into or out of the Timberlake facility and the adjacent side street (Whitcomb Street). This location is just south of the intersection with the I-89/Exit 16 southbound ramps and is also susceptible to traffic backups from that intersection.

37.     VTrans also lists the Roosevelt Highway/Lower Mountain View Drive intersection as a high crash location, although it has not experienced as many reported crashes as the Highway intersection at Appellant Timberlake's facility.

### ii.  *Traffic generated from the proposed Costco development*

38.     In estimating the amount of traffic generated by the proposed development, Applicant's expert relied, in part, upon traffic data from similarly-sized Costco members-only facilities that had added gasoline sales facilities. This historical data provided reliable foundations for these experts' estimates of what new traffic will be generated by the planned Costco expansion and addition of a gasoline sales facility.

39.     Relying upon actual traffic data from area highways and from similarly situated Costco developments, as well as the nationally-recognized Institute of Traffic Engineers Manual on Trip Generation (8th Ed.), Applicant's experts provided the most credible estimates of the increases in traffic likely to be caused by the proposed Costco improvements.

40.     The proposed Costco improvements are likely to cause 155 new vehicle trips during the peak traffic hours. Most of this new traffic will enter the Costco property from the north and will exit using Lower Mountain View Drive, turning left onto the Roosevelt Highway to return

south. Some of these new vehicle trips, however, much like the existing Costco traffic, will travel in other directions when leaving the Costco property.

41. Applicant's traffic experts provided a reliable breakdown of the estimated traffic in their revised calculations contained in Costco Exhibit 3(C) at p. 3. Those calculations credibly estimate that the Costco building expansion would cause up to 15 additional one-way vehicle trips per hour during the weekday afternoon peak hours and that the addition of the gasoline sales facility would cause up to 140 additional one-way vehicle trips during the weekday afternoon peak hours. Applicant's traffic experts also calculated more conservative (i.e.: higher) estimates, based upon the highest historical traffic increases experienced at other Costco expansion sites; the Town and its traffic expert advocated for the use of the higher estimates. We conclude, however, that the more credible facts supported Costco's peak hour estimates for additional traffic attributable to this specific Costco expansion. Costco Exhibit 3(C) at 2–3.

### iii. *Proposed traffic mitigation measures*

42. Allowing the Costco improvements to be permitted, constructed, and operated will exacerbate the traffic congestion on the area highways. However, this effect, when compared with the existing traffic flows, particularly during peak hours, is unlikely to be substantial. As reflected in the credible calculations by Applicant's traffic experts, the proposed improvements may increase intersection wait times and denigrate two intersections from an LOS C to an LOS D. See Costco Exhibits 3(B) and (C). We therefore conclude that the impact is measurable, but not substantial.

43. Because the Costco site improvements will cause additional traffic, and the additions to peak hour traffic will cause further delays to already heavily-travelled and congested highways, Costco proposes to help fund or construct certain improvements. Specifically proposed improvements to Lower Mountain View Drive, at its intersection with the Roosevelt Highway, include:

   a. Addition of a second dedicated left-hand turn lane, for use by travelers turning south on the Highway (one dedicated left hand turn lane already exists);

b. Addition of a second dedicated right-hand turn lane, for use by vehicles wanting to travel north on the Highway; and

c. Addition of another travel lane to serve through traffic and right hand turning traffic on the Highway.

44. These highway intersection improvements are currently estimated to cost $720,000.00.

45. Applicant has also agreed to work with Town and VTrans officials to optimize the synchronization of traffic lights at all area intersections so as to allow for more optimal traffic flow. As currently programmed, these traffic signals do not allow for the most efficient flow of current or expected future traffic.

46. Applicant will also install a "Do Not Block Driveway" sign at the curb cut for Appellant R.L. Vallee's facility along Lower Mountain View Drive so that vehicles queuing to turn onto Roosevelt Highway will be less likely to block access for R.L. Vallee customers, employees, and vendors.

47. Applicant, in consultation with the Town and VTrans officials, proposed that Costco would be responsible for 20% of the total cost of these highway intersection improvements, based upon the estimated portion of total traffic contributed by Costco's existing and future operations (also about 20%). The Court concludes that this is a fair and reasonable calculation, based upon credible evidence of Costco's existing and future traffic impacts.

48. Costco has further proposed that, if it receives final permit approval for its planned improvements and begins construction of its expansions before VTrans or the Town are able to begin construction of these intersection improvements, Costco will construct the intersection improvements and seek reimbursement of the remaining 80% of actual costs after construction is complete.

49. These mitigation measures will not fully alleviate the traffic congestion that the area generally experiences, especially during peak hours at the I-89/Exit 16 intersection with the Roosevelt Highway, but the planned improvements on Lower Mountain View Drive, at the Highway intersection, will alleviate some congestion and increase the capacity of cars to queue along Lower Mountain View Drive while those vehicles wait for signalized turning onto the Highway.

50.     In fact, these mitigation measures will alleviate traffic congestion to such an extent as to fully mitigate the adverse traffic impacts caused by Costco's planned improvements.

### iv. Proposed VTrans improvements to I-89/Exit 16 intersection

51.     VTrans proposes to complete additional improvements to the signalized intersections on the Roosevelt Highway at the I-89/Exit 16 on and off ramps.  These improvements are much needed due to the existing traffic congestion and crashes in the vicinity of these intersections. While these improvements are not part of the permit applications currently pending before the Court, they are worthy of our brief summary because of Appellants' assertion that Costco should be prohibited from operating its planned expansions until after the I-89/Exit 16 intersection improvements are completed.

52.     VTrans has taken on the responsibility of securing all necessary permits for these traffic improvements.  As of the time of trial, these permit proceedings were pending before the District 4 Act 250 Environmental Commission ("District Commission").  See In re Construction of a Double Crossover Diamond Interchange at the I-89 Exit 16 Corridor, Nos. 4C1271, 4C0757-21, and 4C0471-7 (Dist. 4 Envtl. Comm.).

53.     The prevailing theory on how best to improve these intersections and address the traffic congestion is to replace the existing signalized intersections with a signalized interchange, referred to as a Double Crossover Diamond ("DCD").  This design takes some effort to explain and understand, although a site plan and a simulation video prepared by CCMPO and admitted into evidence at our trial as Costco Exhibits I and J, respectively, provide a clear understanding of the DCD design, its intended operation, and why it is expected to improve traffic flow through the intersections with the I-89/Exit 16 northbound and southbound on- and off-ramps.

54.     The DCD, once permitted, constructed, and put into operation, will likely improve the LOS ratings of these intersections; perhaps these improvements will also reduce the frequency of area traffic accidents and result in the removal of these intersections from the listing of high crash areas.  Much like the flow of all traffic in this area, these improvements will improve the flow of traffic on Roosevelt Highway and I-89 that will be travelling to and from the Costco site.

55.     DCD construction will be financed by several sources, including federal funding, state funding, and some funds contributed by area developments.  Costco has agreed to provide its

proportional share of such funding, based upon estimates calculated by Costco, the Town, and VTrans; Costco's share at trial was credibly calculated to be in the neighborhood of $362,100.00.

56. Although it is uncertain how long it may take to complete the DCD improvements, and the timeframe will not be certain until the permit proceedings and any resulting appeals are completed, one estimate at trial was ten or more years.

57. Were we to conclude that Costco should be prohibited from operating the improved portion of its facility until the DCD was operational, a similar rationale would require us to restrict the operation of all area facilities, including those of the Appellants. We have no such jurisdiction to do so, nor would we regard such a suggestion as rational, if we did enjoy such jurisdiction. For all these reasons, we conclude that Appellants' suggestion is not supported by the credible facts.

### C.) Stormwater, wetlands and Impacts.

58. Costco's existing facilities include stormwater treatment systems that were permitted and installed when the Costco facility was first constructed. At the time of the original Costco permitting, the wetland on Lot 5, which receives some of the project stormwater, was designated as a Class III wetland.

59. Costco intends, in connection with its facilities expansion, to upgrade its stormwater systems to improve the treatment of stormwater on the Costco site and provide system components that comply with current stormwater regulations. More details of the proposed stormwater improvements and retrofits are discussed below in Sub-Section ii.

60. Costco faces two general challenges with regards to stormwater treatment: (1) the existing stormwater treatment systems are outdated, not ideally functioning in some places, and require updating if desired to conform to current rules and regulations; (2) by its expansion plans and as a consequence of the reclassification of the Lot 5 wetland, Costco is required to make improvements and expansions to its existing stormwater treatment system.

61. Costco's proposed site improvements and building expansion will add just under one acre of impervious surface to the Costco property, will include redevelopment of just over one acre of existing impervious surface, and will remove about 0.22 acres of existing impervious

surfaces.   See Costco Exhibits 4(E) (Overall Site Plan, Sheet SP1) and Costco Exhibit 5(E) (Stormwater Design Brief) at 5.

### i.  *Existing stormwater treatment systems*

62.    All development that creates additional impervious surfaces (i.e.: roofs, paved driveways, walkways, etc.) can contribute to the flow of surface stormwater onto adjacent grassed areas, wetlands, streams, rivers, and lakes.  When proposed new impervious surfaces exceed one acre in size, the development becomes subject to the Vermont Stormwater Management Rules**.**

63.    Stormwater is not necessarily the culprit here; rather, it is the materials, including eroded dirt and soils, other sediments, oils and other parking area debris that stormwater may transmit to ground and surface waters, which can cause contaminants to enter those waters.

64.    The goal of a properly designed and maintained stormwater treatment system is two-fold: (1) to filer as much as possible of those transmitted materials from the stormwater before it reaches state waters and other resources; and (2) to limit the stormwater flowing off of a project site to the volume of stormwater that flowed off site prior to the proposed development improvements.  See Vermont Stormwater Management Rules, a copy of which was admitted at trial as R.L. Vallee Exhibit 65.

65.    The existing Costco facilities collect an estimated 4,837 lbs. of sediment per year and discharge 1,935 lbs. of sediment off site per year.  See Exhibit 5M at 4.

66.    An additional goal of successful stormwater treatment is for no material increase in the volume or velocity of the stormwater that flows off site, so as to minimize the scouring, erosion, or other damage done to receiving waters and their channels.  Id. at 13.

67.    Stormwater that currently accumulates on the Costco site may leach into groundwater, travel through wet areas and wetlands, filter though grass and wooded areas, and ultimately may discharge into Sunnyside Brook.  Sunnyside Brook discharges into Sunderland Brook, which then discharges into the Winooski River, which ultimately discharges into Lake Champlain.

68.    ANR lists Sunnyside Brook as a "stressed water."  This long-standing designation is due, in part, to the introduction of chloride used in road salt on area highways.  There was no credible evidence presented that Sunnyside Brook earned its "stressed" designation due to

stormwater discharges per se, nor was there any credible evidence presented that Sunnyside Brook is an "impaired water" as that term is used in State water quality regulations.

69.     The Costco site is generally flat, with some gentle slopes away from the building. Thus, when stormwater travels over the site, including over the impervious surfaces (building roofs and paved parking areas), it flows at a relative low velocity towards the adjacent grassed areas and wetlands.

70.     When it was first developed, the existing Costco facility was required to obtain a stormwater discharge permit and to construct and maintain the stormwater treatment systems required under that permit. A copy of Costco's original stormwater discharge permit (Permit #1-0486) was admitted into evidence at trial as Costco Exhibit 5(A). That original permit by its terms expired on June 30, 1992; successive operational permits were issued and are included in Exhibit 5(A).

71.     When the original Costco stormwater treatment system was reviewed, it was governed by the Vermont Stormwater Rules enacted as of 1987. Subsequent Costco applications were governed by the Stormwater Rules enacted as of 2011. See ANR Exhibit 17.

72.     The existing Costco development is subject to prior State Land Use (Act 250) permit proceedings that began in 1978, including those that authorized the original subdivision anticipated in the planned Commercial PUD. See Costco Exhibit 7(A) at Bate Stamp pp. 01667–01679. The first Act 250 Permit Amendment (Permit #4C0288-19) that authorized the development we now know as the Costco facility was issued on February 19, 1993; a copy of that Permit Amendment, together with the Findings of Fact, Conclusions of Law and Order upon which the Permit Amendment was based, is part of Costco Exhibit 7(A) at Bate Stamp pp. 01681–01703. That Act 250 Permit Amendment includes positive findings, terms, and conditions relating to stormwater, wetlands, and water pollution. Id.

73.     Pursuant to that first Costco Act 250 Permit Amendment, the Costco project was found to not be located in or impact any designated headwaters of the State, as defined in 10 V.S.A. § 6086(a)(1)(A). Id. at Bate Stamp p. 01687. While Appellants made assertions to the contrary at trial, no credible evidence was offered to disturb this headwaters determination.

74. Costco's existing stormwater treatment system includes the use of stormwater detention ponds, grassed dry swales, ditches, culverts, and grassed areas along the parking lots that provide some filtering of stormwater.

75. While the existing Costco stormwater treatment system was constructed as permitted (pursuant to the Vermont Stormwater Management Rules in effect as of 1987), it does not conform to the version of those Rules currently in effect.

76. Many of the grassed areas along the parking lots have deteriorated and presently serve poorly as a filter or decelerator of stormwater flowing over the parking areas.

77. The existing stormwater detention ponds do not have sufficient capacity to adequately store stormwater that flows into them during significant storms, particularly during one-year and ten-year storm events. As a consequence, stormwater that is not treated or only partially treated flows out of these ponds and into wetlands and other waters of the State.

78. Stormwater currently flows from the northeast portion of the Costco parking lot to a separate drainage ditch across form Hercules Drive. That ditch has become ineffective, however, partially because the adjacent property owner has filled in the roadside ditch.

79. The existing stormwater system causes stormwater to flow directly into the wetland and other wet areas on Lot 5.

80. Due to the lack of sufficient storage capacity in the existing stormwater ponds and the breakdown of grassed areas as stormwater filters, it is likely that during significant storm events, stormwater flows from the Costco site without receiving sufficient treatment.

81. It is somewhat unfair to compare the treatment effectiveness of a stormwater system permitted and constructed under the 1987 Rules to a system that conforms to the current Rules, since the current Rules provide for a more rigorous level of treatment and required practices.[5] When compared to the proposed stormwater treatment system, however, and particularly when viewed in light of the current Stormwater Rules, the existing stormwater

---

[5] For just one example, we look to the Rules pertaining to the flow of stormwater from impervious surfaces. Under the 1987 Rules, there was no limit on the area of impervious surface over which stormwater could collect and flow before reaching a grassed filter strip. As a consequence, when large areas (such as the Costco parking lots and roofs) collected stormwater and allowed it to travel to a grassed filter strip, the stormwater sometimes does not sheet evenly and the filter strip could become overwhelmed with stormwater flow. Now that the current Stormwater Rules regulate the area contributing stormwater to a designated filter strip, more consistent and effective flow and filtering of stormwater sediment can occur.

treatment system has numerous deficiencies, including the uncontrolled and untreated runoff and ponding of stormwater.

82.     The existing system does not manage stormwater as now required and results in higher offsite discharge rates, including the discharge of untreated stormwater entering the newly reclassified Class II wetland and Sunnyside Brook.  Because of the higher flow rates for stormwater leaving the site, the existing system results in a greater likelihood of off-site stream scouring, erosion, and sediment deposits due to the higher discharge velocity and rates.

### ii.    *Improvements to stormwater treatment systems*

83.     The proposed Costco expansions (the building expansion, new gasoline sales facility, and added parking) will increase the total amount of stormwater that initially falls on the Costco site.  With more stormwater will come more sediment within the stormwater.  Costco and ANR experts provided the most credible calculation of both total stormwater and total sediments. See Exhibit 5(M) (Existing and Proposed Stormwater Treatment Summary).

84.     The proposed system contains numerous treatment improvements and is designed to collect stormwater from both the existing and new developments on the Costco site.

85.     The proposed stormwater treatment system incorporates some existing detention ponds which will be cleaned of sediment and improved upon.  The revitalized detention ponds are referred to within the new treatment system as "Stormwater Wet Pond #1" (located to the north of the proposed gasoline sales facilities) and "Stormwater Wet Pond #2" (located on the edge of the Costco parking lot that lies to the west of the Costco building).  See Costco Exhibit 5(F) at Bate Stamp 01082.

86.     Stormwater Wet Pond #1 will be improved to retain more water.  A new outlet structure will control discharge rates, such that the improved Pond #1 will nearly double the time stormwater is detained during significant (i.e.: 1-year) storm events.  These improvements will also cause a decrease in the peak flow rates, especially for more significant (10-year) storms. See Exhibit 5(E) (Stormwater Design brief) at 4 and Exhibit 5(M) (Stormwater Summary) at 3.

87.     Stormwater Wet Pond #2 will also be cleaned and modified so as to provide increased sedimentation removal via an increase in its ability to detain and store stormwater.  Further, because the outflow orifice will be reduced to a 2.6" opening, the volume and velocity of water

leaving the Pond will be greatly reduced. Costco's experts provided credible estimates of the significant increase in stormwater detention and decrease in velocity, particularly during significant rainstorms (i.e.: 1-year and 10-year storm events). Id.

88.     In general, the proposed system replaces the allowance of overland flows into grass channels and detention basins with dry swales[6] that deliver the collected stormwater to manmade treatment ponds. New trench drains will also collect stormwater from the existing and new impervious surfaces, especially from the area of the new gasoline sales facility, into a newly-constructed underground tank with a capacity of 2,000 gallons which will also operate to separate oil and grit from the stormwater runoff. That runoff will then travel into a forebay[7] and then to another underground tank where it receives further treatment, including the removal of remaining grit, floating items, and oil through a floatable oil separator called a "snout" and another device called an "oil hood." This treatment results in cleaned water being released from this portion of the proposed treatment system. So that this portion of the treatment system remains effective, any collected oil, sediment, grit, and garbage will be periodically cleaned out from these system components.

89.     The new treatment system components were designed to the standards detailed in the Vermont Stormwater Management Manual (April 2002) ("VSMM"), a copy of which was admitted at trial as ANR Exhibit 16.

90.     The new treatment system is based upon an updated drainage area assessment, detailed on Costco Exhibit 5(F) at Bate Stamp p. 01081. This updated drainage area assessment accurately defines the drainage areas and sub-areas into which stormwater from this general area will flow.

91.     With the aid of this drainage area assessment, Applicant has accurately determined how stormwater will flow within the Costco site and after it leaves that site.

---

[6] A dray swale is an "open [earthen] channel explicitly designed to detain and promote the filtration of stormwater runoff through an underlying fabricated soil media." Vermont Stormwater Management Manual (April 2002) at G-3; a copy of the VSMM was admitted at trial as ANR Exhibit 16.

[7] A forebay is an earthen structure, often grass lined, that acts as a "[s]torage space located near a stormwater treatment . . . inlet that serves to trap incoming coarse sediments before they accumulate in the main treatment area." ANR Exhibit 16 at G-4.

92. Specifically, stormwater that flows from the northerly and easterly portions of the Costco parking lots, as well as some developed areas off of the Costco property, will drain into modified pre-treatment structures, including two sediment forebays and a grass channel. See Exhibit 4(R) (Details for Wet Pond #1). These structures discharge to Stormwater Wet Pond #1. Costco will also improve the drainage ditch across from Hercules Drive, where stormwater currently flows from the northeast portion of the Costco parking lot, by installing catch basins in the parking area and an underground pipe that will transmit the collected stormwater to the forebay for pre-treatment, then to Wet Pond #1 for further treatment. See Costco Exhibit 4(F) (erosion control site plan).

93. The velocity of treated water leaving Stormwater Wet Pond #1 will be restricted by a reduction in the size of the Pond outlet to 3". See Exhibit 5(R). Discharges will also flow into an outlet structure that will further regulate and limit the discharge of water. When water reaches the upper level of this outlet structure, the water will travel through an underground 8" pipe which will then terminate and discharge into Sunnyside Brook.

94. This pipe will be located, in part, under what is now a portion of the Lot 5 wetland buffer. However, the pipe will be installed via underground directional drilling and therefore will not cause any disturbance to the wetlands buffer under which it travels; its specific location is detailed in the Stormwater Details Site Plan admitted as Costco Exhibit 4(R).

95. This pipe will then cause the traveling water to discharge into Sunnyside Brook via an outlet structure. The manner in which the pipe and discharge structure will be installed will have no impact upon the surrounding land, the wetland, its buffer, or Sunnyside Brook.

96. Stormwater from the Costco building roof and the westerly portions of its parking lots (both existing and proposed) will flow over the parking areas and into a dry swale. The design and layout of this dry swale will provide more efficient treatment for the collected stormwater, such that about 80% of the sediment in the stormwater will be captured and removed from the stormwater, as credibly detailed in Costco's Stormwater Summary, a copy of which was admitted as Exhibit 5(M).

97. This dry swale will then transmit the treated stormwater to Stormwater Wet Pond #2; both structures are depicted on Exhibit 4(P) (Stormwater Plan).

98.    Once treated, the collected water will flow out of Wet Pond #2, through the reduced orifice, and to a roadside ditch along the easterly border of the I-89 northbound lane.  While the proposed improved facilities are estimated to initially collect 5,996 lbs. of sediment per year, the improvements to the stormwater treatment system will actually reduce the amount of sediment discharged off of the Costco site to 1,439 lbs. of sediment per year.  See Id. at 4.

99.    The improved stormwater treatment system will also cease the direct flow of stormwater into the Class II wetland on Lot 5, since protected wetlands are not an allowed means by which to discharge or treat stormwater.  Appellants acknowledged that un-treated stormwater should not be allowed to flow into a protected wetland, but nonetheless asserted that this change in Costco's treatment system will harm the wetland, because the loss of un-treated stormwater will cause the water level in the wetland to be significantly reduced.  No credible evidence supported this assertion and Costco's and ANR's experts offered credible evidence to refute Appellants' assertion.

100.    Appellant's also alleged that the proposed Costco stormwater treatment system will adversely reduce the ability of groundwater to be recharged in this area.  Costco and its experts credibly refuted Appellants' assertion; the rate at which groundwater is recharged from surface or storm waters will not be diminished in any significant way.

101.    The proposed improvements to Costco's stormwater treatment system will treat all stormwater discharges from all existing and proposed Costco developments, will improve the treatment and removal of sediments from the stormwater, and will reduce the flow and velocity of stormwater, particularly when compared to the treatment, flows and velocity from the existing stormwater system.

### iii.  *Wetland 5, its Reclassification, and Impacts on its 50' Buffer*

102.    Lot 5 contains a wetland that encompasses about 7.5± acres.  Much of the wetland is covered with trees and vegetation particular to wet areas.  See Exhibit 4(Y) (Wetland Plan).  An ANR expert credibly described this wetland as an "emergent, shrub, and forested wetland."

103.    The wetland's entire westerly boundary abuts the boundary of the northbound lane of I-89.  See Exhibit 4(D) (Existing Conditions Site Plan) for the general location of this wetland.

104. When Costco first obtained permitting and at the time of Costco's pending State and municipal land use applications, the Lot 5 wetland was designated by ANR as a Class III wetland and therefore deemed insignificant and not requiring protection under the Vermont Wetland Rules ("VWR").

105. The actual buffer surrounding the Lot 5 wetland is irregular and often less than fifty feet in width. In fact, in some areas, including where it adjoins Lower Mountain View Drive and the Costco development, there is little or no buffer between the wetland and the edge of development. These circumstances did not constitute a violation of the applicable permits or Wetland Rules at the time the development was first constructed, as the wetland had not yet been classified as a protected wetland.

106. Many of the other areas adjoining the Lot 5 wetland have also been developed, including the areas to the north and east and along Lower Mountain View Drive as it approaches the Costco development.

107. The grassed areas along the Drive that borders the wetland were often cut, such that the buffer's ability to provide protection or filtering for the wetland has been diminished or eliminated.

108. Buffers to wetlands generally provide protections for those wetlands, including the filtering of stormwater that may flow into the wetland from adjoining development. A sufficient buffer also provides protection for, and increases the utility of the important functions and values that a wetland may serve.

109. ANR experts credibly showed that the Lot 5 wetland provides two of the ten identified important wetland functions and values in the Vermont Wetland Rules: (1) it provides important water storage capacity, thereby protecting the surrounding area by reducing the likelihood of flooding during significant storms; and (2) it provides significant protection from contaminants for surface and groundwater. Neither Costco nor Appellants provided credible evidence to refute these ANR representations.

### iv. *Impacts of proposed development within the wetland buffer*

110. The parties, particularly ANR and Costco, engaged in a procedural dispute as to whether the Lot 5 wetland buffer should be 50 feet in width, as required by 10 V.S.A. § 902(9) for Class II

wetlands, or whether ANR should permit Costco to complete developmental improvements within the established 50-foot buffer. Costco advocated for both a reduced wetland buffer (the subject of its appeal in the <u>Wetlands Reclassification Appeal</u>) and authority to develop within a portion of the established wetland buffer; ANR granted Costco that authority, which is the subject of the <u>Wetlands Permit Appeal</u>, an action in which R.L. Vallee remains as the only Appellant.

111. Costco provided no factual foundation, nor legal authority, for why ANR should not initially establish a 50-foot buffer for the Lot 5 wetland. Conversely, ANR presented credible evidence showing that a minimum 50-foot buffer to Class II wetlands generally helps protect the important functions and values served by such wetlands.

112. Costco did, however, present credible evidence to show that the proposed development within the 50-foot wetland buffer is limited and will have negligible impacts upon that wetland's ability to serve the two identified functions and values. ANR does not object to the limited development within the buffer that Costco proposes.

113. Costco <u>does not</u> propose development within the Class II wetland itself, only in a small portion of its buffer. Those new developments are limited to areas where development already occurs. Costco further proposes to cease the practice of allowing stormwater, often with little or no treatment, from entering the now-protected wetland and its buffer.[8]

114. In particular, Costco proposes to reduce or eliminate the lawn maintenance cuttings that currently occur within the 50-foot buffer alongside Lower Mountain View Drive. There was also some evidence that Costco, or others, sometimes trim or cut grass and other vegetation within the actual wetland. Costco pledges to cease all cutting practices in the Class II wetland or its buffer.

115. The wetland buffer will only be reduced to less than fifty feet in the area designated for re-development to host the proposed gasoline sales facilities. See Exhibit 4(Y), which depicts both the existing conditions and the area of proposed wetland buffer impacts.

---

[8] In the course of this discussion we conclude that it is important to repeat that when this wetland was regarded as a Class III (unprotected) wetland, there was no statutory or regulatory mandate to protect its buffer.

116. This portion of the wetland buffer is already encroached upon by the existing development which, together with an additional portion of the wetland buffer, will be redeveloped and re-graded to accommodate the proposed gasoline sales facilities. Id.

117. This redeveloped area will also capture stormwater runoff that is presently entering the wetland and its buffer; the current circumstances allow stormwater to enter the wetland with minimal or no treatment. Under the proposed improvements to the stormwater system, the stormwater will be captured, treated, and deviated away from the Class II wetland and its remaining buffer.

118. Based upon the credible evidence presented, we conclude that the totality of Costco's proposed improvements (in particular, the redevelopment of a portion of the Costco parking lot for the proposed gasoline sales facility and the improvements to the stormwater treatment system) will improve the ability of this wetland to: (1) provide important water storage capacity, thereby protecting the surrounding area by reducing the likelihood of flooding during significant storms; and (2) provide significant protection from contaminants for surface and groundwater. We further conclude that this Class II wetland will not be adversely impacted by Costco's proposed development.

119. Appellants offer further assertions of how Costco's plans will adversely impact the Class II wetland and the nearby groundwater resources. In particular, Appellants assert that Costco's plans to divert stormwater from the wetland will cause the water level in the wetland to somehow be significantly reduced, thereby negatively impacting upon the wetlands, and the important functions and values that it serves. ANR and Costco discredited Appellants' assertions and the expert who offered them, including by noting that the expert's modeling was based upon a hypothetical that assumed that no rain will fall in this area for more than 1,000 days. ANR and Costco credibly showed that Costco's plans will not result in any material diminishment of the water level in this Class II wetland.

120. Appellants also asserted that the improvements to Stormwater Wet Ponds #1 and #2 will cause a cone of dispersion in the surrounding groundwater that will further reduce the groundwater table in the nearby area. This assertion is without merit. We further note that in

some of these areas, particularly surrounding the nearby Class II wetland, the ground water table is at or nearly at the surface level of the ground.

### v. *Proposed Chloride Reduction Plan*

121. Costco also plans to address the high level of chloride in the area stormwater and Sunnyside Brook by implementing a plan to reduce the chloride that is presently captured in stormwater runoff. As noted above, high levels of chloride present in Sunnyside Brook have contributed to that stream being identified as a stressed water.

122. Chloride enters the area stormwater through the use of salt during winter roadway maintenance and clearing. Costco and the other commercial development owners use chloride in their roadway and parking area clearing and maintenance, and the Town and VTrans employees also use chloride in their winter roadway clearing practices. As a result, there sometimes is overlap and areas that receive multiple applications of chloride treatment.

123. Costco applies only a small percentage of the total chloride used on area roadways and parking areas.

124. Costco proposes to implement, monitor, and maintain a Chloride Reduction Plan that will have several components, including (1) evaluating and reducing redundant de-icing efforts by Costco and the Town; (2) use of alternative de-icing products for Costco parking areas and roadways; and (3) limiting the use of rock salt, when possible, during winter events when the outside temperature is not above 15° Fahrenheit.

125. Costco's Plan will improve existing conditions and reduce the chloride runoff from the Costco site. While the State does not have or enforce a chloride use standard, ANR has reviewed and approved of Costco's Chloride Reduction Plan.

### D.) Other miscellaneous improvements.

126. Costco plans to add further directional signs on Lower Mountain View Drive to assist travelers entering and exiting the Costco facility. It also proposes to install identification signs for its proposed gasoline sales facility. See Costco Exhibit 4(U). Costco also proposes to improve and add to its parking area lighting. See Costco Exhibit (V). No party offered objections or opposition to Costco's proposed signs or additional lighting plans.

127.    Costco also presented detailed landscaping plans, including added plantings and landscaped parking lot islands.  See Costco Exhibits 4(H), (I), and (J).  During Day 5 of our trial, Appellants and Costco stipulated that the proposed landscaping conformed to all applicable state and municipal land use criteria.

## Conclusions of Law

As in all de novo appeals presented to this Court, we consider all legal issues preserved for our review in an appellant's statement of questions.  V.R.E.C.P 5(g).  In these coordinated appeals concerning the proposed Costco expansion, we have benefitted from each Appellants' efforts to narrow and focus our review on the legal issues that are most relevant to their concerns.

As noted above, Timberlake determined during the course of our trial that it no longer needed a review of the independent legal issues initially presented in the Timberlake appeal and cross appeals.  We therefore granted Timberlake's request to dismiss its independent appeals, leaving Timberlake to retain its party status as an Interested Person in the appeals of R.L. Vallee and Costco.

Costco initially brought challenges to Timberlake's assertion of party status in some of the pending appeals, including on the identified stormwater and wetlands issues.  At the conclusion of the evidentiary hearing, however, Costco advised that it had accepted Timberlake's request that Timberlake has party status on all of what the parties and the Court had commonly referred to as the "water issues."

Also at the conclusion of the evidentiary hearing, the Court asked Costco to clarify what, if anything, remained of its challenge to ANR's wetlands reclassification determination in the Wetlands Reclassification Appeal, Docket No. 132-10-13 Vtec.  Costco's legal representative responded that Costco "no longer has a dispute with the wetlands reclassification determination," but that it wished to continue to assert that either the protected wetland buffer should be less than fifty feet, or that its application for a wetlands permit (which is the subject of the Wetland Permit Appeal, Docket No. 59-5-14 Vtec) should be affirmed, such that its proposed gasoline sales facility could be developed within a portion of the fifty-foot buffer.

-28-

We therefore first address these two appeals and those limited legal issues, followed by the Questions in the remaining appeals.

## I. <u>Lot 5 Wetland, its Buffer, and Impacts of the Proposed Development</u>

In rendering a determination in this de novo appeal, we are charged with hearing the evidence anew and rendering our own determination in place of the appealed-from determination rendered by ANR and premised upon the substantive legal standards applicable to ANR's review below. V.R.E.C.P. 5(g).

Wetlands classifications depend upon whether the identified wetland provides for important functions and values, as identified in the Vermont Wetlands Rules, including:

a. temporary water storage for flood water and storm runoff;
b. contributes to the quality of surface and ground water;
c. fish habitat;
d. wildlife habitat;
e. exemplary wetland for a natural community;
f. rare, threatened, and endangered species habitat;
g. education and research in natural sciences;
h. recreational value and economic benefits;
i. open space and aesthetics; and
j. erosion control through binding and stabilizing the soil.

Vermont Wetlands Rules §§ 5.1–5.10, Code of Vt. Rules 12 030 026 (available at www.lexisnexis.com/hottopics/codeofvtrules) (hereinafter "VWR"); see also 10 V.S.A. § 905b(18)(A). The credible and generally undisputed evidence presented at trial showed that the wetland on Lot 5 serves two important functions and values: (1) important water storage capacity, thereby protecting the surrounding area by reducing the likelihood of flooding during significant storms; and (2) protection from contaminants entering surface and groundwater. The manner and quality by which this wetland serves those functions and values are significant and qualifies this wetland as worthy of protection under the Vermont Wetlands Rules. See VWR § 5; see also 10 V.S.A. § 914. In light of these determinations, we conclude that the wetland on Lot 5 is significant, due to its ability to satisfy two important functions and values for this area. Due to the important functions and values that it serves, this wetland warrants protection as a Class II wetland. We therefore **AFFIRM** ANR's reclassification determination in Docket No. 132-10-13 Vtec.

Having determined that the Lot 5 wetland warrants Class II protection, we further conclude that the credible facts require that its established buffer be fifty feet in width. We are advised by both the applicable law (10 V.S.A. § 902(9)) and Regulations (VWR § 4.2) that the buffer zone for a Class II wetland "shall extend at least 50 feet from the border of the wetland" unless the ANR Secretary (or this Court on appeal) determines under 10 V.S.A. § 914 that a lesser width of the wetland buffer is warranted.

We concur with ANR on its offered reasoning that the buffer for the Lot 5 wetland should be 50 feet in width, principally for a procedural reason. As explained below, we conclude that the currently-proposed Costco expansions will have no more than a minimal impact upon the wetland and the functions and values it serves. However, were we to conclude that the credible facts warrant a narrower buffer (as Costco suggests), ANR's jurisdiction and authority over that wetland would only extend to the limits of that narrower buffer area. Thus, any development that Costco proposed now or in the future that was outside that narrowed buffer would not be subject to review under the Vermont Wetlands Rules. We are particularly concerned about this procedural reality, given that Costco proposes development nearly next to a small portion of the wetland bank, in the area of its proposed gasoline sales facility.

We are therefore unwilling to generally conclude today that the buffer to this wetland should be less than 50 feet. We therefore answer Costco's single Question in the <u>Wetlands Reclassification Appeal</u> in the affirmative: the imposition of a 50-foot buffer relative to the Class II wetland on Lot 5 <u>is needed</u> to protect the important functions and values that the wetland serves. Thus, we **AFFIRM** ANR's conclusion that the Lot 5 wetland's important functions and values direct that this wetland be protected by a buffer that is no less than 50 feet in width.

We now turn to the remaining legal issue in the <u>Wetlands Permit Appeal</u>, filed by R.L. Vallee: a challenge to ANR's determination that Costco's proposal for the gasoline sales facility,

portions of which will be located next to an edge of the Lot 5 wetland, will have no more than a minimal impact upon that wetland and its important functions and values.[9]

The starting point for our analysis is that no activity should be permitted within a protected wetland or its buffer unless it can be shown that the proposed activity "will have no undue adverse effect on the protected functions and values" of the protected wetland. VWR § 9.5(a). Applicants also must prove that the proposed activity otherwise "complies with these [Wetland R]ules." Id. The only focus[10] of all the parties in this appeal was whether Costco's proposed activities within the wetland buffer would cause an undue adverse impact. We therefore turn our attention to that legal analysis.

The phrase "undue adverse impact" is a term of art often used in land use litigation, particularly concerning Act 250 permit applications. See In re Chaves Act 250 Permit Reconsideration, 2014 VT 5, ¶ 23, 195 Vt. 467 (quoting In re Eastview at Middlebury, 2009 VT 98, ¶ 20, 187 Vt. 208). In this instance, however, we ignore what has often been referred to as the *Quechee Test* because the applicable VWR provisions provide for a different, perhaps more stringent, definition of that term. We are directed to define "undue adverse impact" to a protected wetland as any impact that causes more than "a minimal impact." VWR § 9.5(b). The Rule continues on, however, to note that an undue adverse impact may nonetheless be allowed, if it fulfills three stated conditions. Id.

We begin our analysis by reviewing how this wetland existed and operated when Timberlake filed its reclassification petition. See In re Home Depot, USA, Inc., No. CUD-00-07, at 2 (Vt. Water Resources Bd. Mar. 16, 2001) (comparing proposed stormwater treatment system with existing system).[11] At that time, the Lot 5 wetland was surrounded by existing commercial activities that had already been established within the Commercial PUD. Since the wetland was then regarded as a Class III wetland, it was not protected from the possible impacts of those developments. In some instances, particularly along Lower Mountain View

---

[9] We explain below how R.L. Vallee consolidated the legal issues remaining to be addressed in these coordinated appeals. Our discussion begins on p. 36, below

[10] R.L. Vallee also raises a procedural challenge to Costco's plan to install a pipe and discharge system that runs from Wet Pond #1 to the banks of Sunnyside Brook. We discuss that challenge next in our analysis.

[11] We afford prior decisions of the Vermont Water Resources Board, as well as those of other predecessor entities, the same precedential weight as prior decisions of our Division. 10 V.S.A. § 8504(m).

Drive, next to the Costco parking lot, and just north of the wetland, the buffer between the wetland and development was minimal or non-existent. In certain areas where a grass filter strip had been installed between the wetland and the development, the grass filter was not well maintained and irregular in several places. Due to the wetland's non-protected classification, stormwater was allowed to flow directly into the wetland with little or no treatment.

Costco proposes to protect the wetland and most of its buffer. In the area where Costco proposes to develop the gasoline sales facility, development will be within the wetland buffer. However, this area of development will occur in an area that is already developed with the existing Costco parking area. That parking lot pavement will be torn up and replaced with new concrete and pavement for the gasoline facility, but that area will be no closer to the banks of the wetland than is the current development. Costco will install erosion control measures to protect the wetland from construction activities and stormwater flow.

Further, Costco will install and maintain an improved stormwater treatment system that will cease the practice of letting stormwater flow directly into this wetland; that stormwater will be sufficiently treated before it flows into the ditch along the northbound lane of I-89. Thus, when comparing the impacts to this wetland before and after Costco's proposed improvements, we conclude that the proposed improvements will have no more than a minimal impact. In fact, the impacts of the proposed development upon this wetland may actually be beneficial.

R.L. Vallee asserts that a component of Costco's proposed stormwater treatment system was not fully disclosed during ANR's review of Costco's wetland permit application, specifically a pipe and discharge structure that will be partially located within the wetlands buffer (See Costco Exhibit 4(R) and Findings 83–94, above), and that since this component was not discussed during ANR's review of the wetland permit application, that the Court must remand the application back to ANR for consideration of the proposed pipe and outlet impacts on the buffer, the wetland, and the important functions and values. ANR confirmed that the pipe and outlet structure was not reviewed in the course of the wetland permit application process and suggests that, while the Court should affirm the wetland permit ANR issued, the Court should

also require Costco to apply for a new wetland permit or amendment to address the stormwater pipe and outlet structure and its impacts upon the Class II wetland and its buffer.

Significant land use applications often go through a number of permutations, particularly when neighbors raise concerns about how a project may impact them, their property, or the surrounding natural resources. This is a reality often faced by parties, the appropriate State and municipal panels that review applications, and this Court, when presented with an appeal. When such changes are made to an application that continues to request that same approval,[12] but changes the site plan or its accesses, we must consider whether those changes warrant a remand, so that the panel appealed from may conduct a hearing and afford other neighbors the opportunity to consider the site plan changes. In re Lathrop Ltd. Partnership, 2015 VT 49, ¶ 109 (directing that remand is necessary where revisions to a project are made while an appeal is pending "that may implicate new criteria not before the environmental court or affect new parties not participating in the proceedings").

But the Supreme Court has also cautioned that remand is not always warranted when a site plan is changed, especially when the changes are "truly minor" in scope and there is no evidence presented that such changes may implicate new review criteria or may impact one or more new neighbors. Id. To require remand in all instances where an applicant makes changes to its plans, particularly when changes are made to address some concern expressed by those who are already parties to the proceeding, would be tantamount to allowing land use litigation to become a "procedural ping pong match." Id. at ¶ 100 (quoting In re Sisters & Bros. Inv. Grp., LLC, 2009 VT 58, ¶ 21, 186 Vt. 103 (noting that to accede to an objector's insistence to remand in such instances would be tantamount to allowing that objector to impose a "heads-I-win-tails-you-loose approach" to a land use application)).

We enjoy the same powers and authority that are enjoyed by the appropriate panels from which a land use appeal has been taken; to the extent that the panel appealed from had the authority to entertain a plan revision without requiring a new application or noticed proceeding, this Court may do the same on appeal. In re Torres, 154 Vt. 233, 235–36 (1990).

---

[12] When an application changes so materially that the very nature of the type of approval requested changes, a remand to the panel appealed from, or dismissal of an appeal so that the applicant may pursue an entirely new application, is required. In re Torres, 154 Vt. 233 (1989).

Here, there was no suggestion at trial that Costco's inclusion of the pipe from Wet Pond #1 was such a material change as to alter the very nature of what was applied for, or that it required new notice to parties that were not already participating in the de novo appeal proceeding.

The fact that Costco intended to install the pipe with directional underground drilling is the basis for our Finding that no impacts will occur to the wetland from the pipe installation (Findings No. 94–95). Even the installation of the outflow structure will be a minor construction matter with no stated impacts to the wetland or its buffer. In reviewing the pipe and outflow structure plans (Exhibit 4(R)), we note that the outlet structure will be installed adjacent to a pre-existing culvert that already transports stormwater to Sunnyside Brook. Lastly, given the notations on the Stormwater Details Plan (Exhibit 4(R)), it appears that the details of this pipe and outlet structure were the subject of a delineation completed in 2008.

A further factor for consideration is that the wetland buffer through which the underground discharge pipe travels was not even delineated when Costco first filed its wetland permit application; the reclassification of the Lot 5 wetland from Class III (unprotected) to Class II (protected) did not occur until several months before we commenced our trial. A most likely explanation of the underground discharge pipe is that it was disclosed but not considered because at that time, no wetland buffer had been delineated. Costco has essentially acceded to Appellants' reclassification petition (after having appealed ANR's approval) to show that even as a now protected Class II wetland, its impacts will be insignificant on that wetland and its recently-designated buffer.

Hence, while it is not disputed that ANR did not review the pipe and outlet structure during its proceedings on Costco's wetland permit application, we are inclined to think that the pipe and structure were disclosed by Costco, but simply didn't raise enough concern for ANR or the other parties during the wetland permit proceedings. If our assessment is correct, then the Torres doctrine would allow us to consider this portion of Costco's plan, even if ANR did not do so in its first review. Id. Even if we are incorrect in this assumption, we conclude that the credible evidence showed that this underground pipe and outlet structure will have no more than minimal impacts, if any, on the protected wetland buffer and will not impact individuals who are not already parties to these proceedings and are not, therefore, so material as to warrant

remand for a wholly new review and notice publication by ANR.  We therefore approve of the pipe and outlet structure's inclusion in Costco's proposed improvement plans.

Based upon this analysis, we answer R.L. Vallee's Questions 18 and 19 from its Consolidated Statement of Questions (filed May 30, 2014) in the affirmative:  Costco's application for an individual Wetlands Permit (which is the subject of Docket No. 59-5-14 Vtec) should be granted.

For all these reasons, we **AFFIRM** ANR's granting of Costco's wetland permit application in Docket No. 59-5-14 Vtec, based upon the development plans detailed in Costco's site maps, including the development of the gasoline sales facility within a portion of the southern boundary of the wetland's 50-foot buffer and the inclusion of an underground discharge pipe located, in part, within the designated buffer for the Class II wetland on Lot 5.[13]

Now that we have addressed all remaining legal issues in the Wetland's Reclassification Appeal and the Wetlands Permit Appeal, we address the remaining legal issues in the three remaining appeals.  Two reference materials aided our review of these remaining legal issues: first, R.L. Vallee's Amended Consolidated Statement of Questions (filed May 30, 2014) and, second, the record from the last (tenth) day of the evidentiary hearing (July 2, 2014), during which the Court and the parties reviewed R.L. Vallee's Amended Consolidated Statement of Questions and noted R.L. Vallee's clarifications of what legal issues remained at issue.  The Court refers the reader to the record on that day that begins at 1:27 PM; the relevant discussion lasts for just over twenty minutes.

The review below follows the order and numbering of Questions listed in R.L. Vallee's Amended Consolidated Statement of Questions.

---

[13] Our conclusions here address all of the legal issues raised in R.L. Vallee's appeal of ANR's approval of Costco's wetland permit application.  Specifically, we answer both of the remaining Questions in R.L. Vallee's Amended Consolidated Statement of Questions (filed May 30, 2014) in the affirmative: in response to Question 18, we conclude that Costco's proposed project does "qualify" for and wetlands permit and, in response to Question 19, that the wetlands permit should be issued for the project, as requested.

## II. Final Plat & Site Plan Amendment Appeal (Docket No. 104-8-12 Vtec)

### i. Question 3:[14] Parking Lot compliance with Regulations §§ 10.01(C)(1)(a) and (b), 10.01(D)(4) and (5), and 10.01(K).

Question 3 asks whether the parking lot proposed by Costco is subject to current standards for layout and design, including landscaping islands, and whether the proposed parking lot complies with these standards. These standards include Colchester Zoning Regulations ("Regulations") §§ 10.01(C)(1)(a) and (b), 10.01(D)(4) and (5), and 10.01(K).

Regulations § 10.01(C)(1)(a) and (b) relate to internal landscaping requirements for parking areas; subsection (a) requires that 10% of off-street parking areas containing 20 or more spaces be landscaped with trees, shrubs, and other plants, while subsection (b) requires planting islands. Regulations § 10.01(D)(4) and (5) relate to the number of required parking spaces; subsection (4) limits the number of parking spaces to no more than 110% of the required number and subsection (5) establishes mitigation strategies for parking areas with more than 250 spaces. Regulations § 10.01(K) requires bicycle parking or storage for properties with 20 or more parking spaces.

Costco's existing parking lots contain 632 parking spaces. Costco proposes to demolish a small portion of its parking lot and reconfigure its parking area so that the improved lots will accommodate 639 parked vehicles. See Costco Exhibit 4(G). Thus, no more than seven new parking spaces will be created. These additional spaces contain sufficient landscaping, screening, and planting islands, and therefore those sections of the Regulations are satisfied. The addition of only seven spaces do not implicate the cap on parking spaces in Regulations §§ 10.01(D)(4) or (5), or require an additional bicycle parking or storage under Regulations § 10.01(K). For these reasons, we conclude that Costco's proposed improvements comply with all the Regulations provisions cited in R.L. Vallee's revised Question 3.

---

[14] R.L. Vallee advised after the close of the evidentiary hearing that it had voluntarily withdrawn Questions 1, 2, 4, and 5; these Questions are therefore not addressed in this Decision.

## ii. Question 6: Must the traffic improvements be made before Costco occupies and operates its improved facilities, particularly the gasoline sales facilities?

Question 6 asks whether the traffic improvements must made before Costco operates its improved facility. These include improvements to Lower Mountain View Drive, at its intersection with the Roosevelt Highway, including a second dedicated left-turn lane, a second dedicated right-turn lane, an additional travel lane for through traffic, and a "Do Not Block Driveway" sign at the curb cut for R.L. Vallee's facility, as well as VTrans' proposed improvements to the signalized intersections on the Roosevelt Highway at the I-89/Exit 16 on and off ramps.

While R.L. Vallee poses this Question in the <u>Final Plat & Site Plan Amendment Appeal</u>, it does not cite a specific Regulations provision at issue. Although we discuss the legal issue presented here in more detail in the section reviewing conformance to Act 250 Criterion 5, we briefly discuss this legal issue here as well, given that we have the power under the Regulations to impose conditions upon approval of an applicant's site plan and final plat.

Costco acknowledges that its proposed improvements, particularly its proposed gasoline sales facility, will add traffic to the already-congested area highways. At peak hours, the Costco improvements may add as many as 155 new one-way vehicle trips per hour. Given that at peak times, as many as 2,400 vehicles per hour pass through the nearby Roosevelt Highway/I-89 intersections, we conclude that the traffic added because of Costco's improvements will not be significant. However, because those area highways and intersections are already so congested and snarled, the Court welcomes Costco's plans to complete certain improvements on area highways. Those improvements, to be completed by the Town, VTrans, or Costco, with Costco bearing the responsibility of twenty percent of the cost, are detailed above in Findings 43–49.

The intersection, signage, and traffic signal improvements that Costco proposes will not fully alleviate the congestion caused by all area traffic. VTrans' proposal to pursue permits for and construct the DCD (Double Crossover Diamond) improvements at the Roosevelt Highway/I-89 intersections, as well as related highway corridor improvements, will likely contribute to relieving that highway congestion. But, absent any cite to the Regulations, we reject R.L. Vallee's suggestion that Costco should be prohibited from operating its gasoline sales facility

until those VTrans improvements are completed. Costco is not the sole cause of this traffic congestion. The improvements Costco proposes will fully mitigate the additional traffic that the proposed Costco improvements will generate, and Costco has agreed that it will not occupy and operate its completed gasoline sales facility until those highway improvements are completed. We therefore see no rational basis for further delaying Costco's operation of its improved facilities.

We hope that the VTrans improvements are merely years, rather than decades away. But we don't see a sufficient correlation between the proportions of traffic contributed by Costco to warrant restricting their gasoline sales until all highway improvements are completed. In fact, we regret that after hearing all the evidence, Appellants'[15] suggestions that the Costco gasoline sales should be so restricted appears to just be a thinly-veiled effort to frustrate a competitor's opportunity to compete in the area marketplace. Appellants' suggestion has no foundation in the credible evidence presented; it is for that reasons that we answer R.L. Vallee's Question 6 in the negative.

### iii. Question 7: Are the proposed traffic improvements sufficient?

In light of the Factual Findings and Legal Conclusions discussed above, we conclude that R.L. Vallee's Question 7 requires only one further word to supply a sufficient answer: "Yes."

We have reached this conclusion after having considered the applicable Regulations provisions, including Regulations §§ 8.07(A)(4), §§ 10.01(C)(1)(a) and (b), and §§ 10.01(D)(4) and (5). As worded, this Question appears to simply ask whether all traffic improvements are "sufficient," including both the intersection, signage, and signaling improvements proposed by Costco and the DCD and related corridor improvements proposed by VTrans. As discussed above, all of the improvements together are likely to provide significant and positive impacts upon the congestion of area highways. To the extent that we are jurisdictionally required to limit our analysis of this Question to just the improvements Costco has pledged to complete prior to operation of its gasoline sales facility, we also conclude that those improvements are a

---

[15] We use the term "Appellants" here and elsewhere in this section to refer to both R.L. Vallee and Timberlake, since at the time that these assertions were made during our evidentiary hearing, Timberlake had not yet withdrawn its appeal and cross-appeals and joined R.L. Vallee vigorously in making these assertions.

sufficient mitigation of all the additional traffic that will be caused by the Costco expansions, even when measured during peak traffic hours. We therefore conclude that the project will not cause any unreasonable congestion or unsafe conditions after the Costco-specific improvements are made.

The additional provisions cited, from section 10 of the Regulations, relate to internal landscaping requirements for parking and the number of parking spaces. The sections referenced, however, have little to do with traffic, focusing rather on parking spaces. Regardless, as we determined in the prior section, to the extent these sections are applicable the development complies with their requirements.

### iv. Question 8: Does the project make adequate provision to prevent soil erosion?

Section 8 of the Regulations provides the standards and guidelines for site plan and conditional use review. In its Amended Consolidated Statement of Questions, R.L. Vallee cites the Court specifically to Regulations §§ 8.07(A)(1) and (3), which provide some guidance on how to address this Question. These subsections address undue water or air pollution and unreasonable soil erosion or reduction in the capacity of the land to hold water. In response, we note that Costco has presented credible and complete plans to improve its stormwater treatment systems, such that we conclude that the proposed improvements, if constructed and maintained as proposed and permitted, will not cause "undue water or air pollution" and will not cause "unreasonable soil erosion or the reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result." Id. In rendering this conclusion, we also reference Costco's Erosion Controls Details Site Plan (Exhibit 4(T)) and the fact that no contradictory evidence was offered on this point.

Section 9 of the Regulations pertains to planned unit development review. Costco has not applied for an amendment to the existing Commercial PUD permits; rather, it has only applied for authority to improve its developed site. Nonetheless, we consider those Regulations provisions that R.L. Vallee referenced in its Question 8, to the extent that they pertain to the sufficiency of Costco's plans to prevent soil erosion.

Regulations §§ 9.01(C)(4), (5), (6), and (7) (the latter making reference to the Town of Colchester Subdivision Regulations) all provide some guidance in regards to making sure that a

proposed development has design, scale, and functional characteristics to help prevent erosions in affected areas. For the reasons already stated, and those also stated in the section below addressing conformance to Act 250 Criteria 1, 1(A), 1(B), 1(E), 1(G) and 4, we answer R.L. Valle's Question 8 in the affirmative by stating that the Costco improvements as proposed do make adequate provision to prevent soil erosion.

v. **Question 9: Does the project adequately protect wetlands and other area water resources?**

Our review of the legal issues posed in R.L. Vallee's Question 9 need not be extensive, since we have already addressed in detail the possible impacts upon the adjacent wetland on Lot 5. R.L. Vallee cites to Regulations §§ 8.07(A)(1) and (3) and the Colchester Subdivision Regulations applicable by virtue of § 9.01(C)(6). As stated above, § 8.07(A)(1) relates to undue air or water pollution, § 8.07(A)(3) relates to unreasonable soil erosion, and § 9.01(C)(6) provides some guidance in regards to making sure that a proposed development has design, scale, and functional characteristics to help prevent erosions in affected areas.

Other than the man-made detention ponds that are part of Costco's improved stormwater treatment system, we were not made aware of other adjacent wet areas other than the Lot 5 wetland. To the extent that this Question was posed to also allow for review of the possible impacts upon Sunnyside Brook and the waterways into which it discharges, we note that Costco's stormwater treatment system and planned Chloride Reduction Plan will improve the quality of waters flowing off of the Costco site and into Sunnyside Brook and other receiving waters. Finally, we did not find credible Appellants' assertions during trial that Costco's plans will have any adverse impacts upon groundwater or other water resources.

## II.     Act 250 Appeal (Docket No. 41-4-13 Vtec)[16]

### i.    Conformance with Act 250 Criteria 1, 1(A), 1(B), 1(E), 1(G), and 4 (10 V.S.A. § 6086(a)) (i.e. the "Water Issues")

We note that in its post-trial briefing, Appellant R.L. Vallee only offers legal analysis under Act 250 criteria 1(E) (streams) and 4 (erosion).  Nonetheless, we briefly address the other Act 250 sub-criteria cited in R.L. Vallee's Question 10.

Act 250 Criterion 1 directs that a proposed development, if permitted, may not result in undue water or air pollution.  10 V.S.A. § 6086(a)(1).  No credible evidence was presented that the proposed Costco improvements will cause such pollution.  We therefore conclude that the Costco improvements as proposed will not cause any further undue water or air pollution and are in conformance with Act 250 Criterion 1.

Act 250 Criterion 1(A) is commonly referred to as the "headwaters protection" criterion.  There are further designated areas protected under this sub-criterion.  See 10 V.S.A. §§ 1086(a)(1)(A)(ii) through (v).  We note above at Finding No. 73 that the District Commission's prior finding that no headwaters are located within or impacted upon by the Costco development was not refuted during our trial.  We also did not receive any evidence of the other sub-sections of 10 V.S.A. §§ 1086(a)(1)(A) being impacted.  We therefore conclude that the proposed Costco improvements will not cause a reduction of the quality of the ground or surface waters flowing through these important resources and conclude that the proposed Costco improvements are in conformance with Act 250 Criterion 1(A).

Act 250 Criterion 1(B) prohibits the injection of waste materials or any harmful or toxic substances into groundwater or well.  10 V.S.A. § 6086(a)(1)(B).  Costco presented credible and uncontested evidence that its proposed improvements conform to all applicable health and environmental conservation department regulations regarding the disposal of wastes and will not involve the injection of waste materials or any harmful or toxic substances into groundwater or wells.  R.L. Vallee made no credible showing to contradict this finding.  We therefore conclude that the proposed improvements conform to Act 250 Criterion 1(B).

---

[16]  All of the legal issues that R.L. Vallee presents in the Act 250 Appeal are contained in its Question 10 from the Amended Consolidated Statement of Questions (filed May 30, 2014).

Act 250 Criterion 1(E) requires that a proposed development may only receive Act 250 approval if the proposed development and its impacts "will, whenever feasible, maintain the natural condition of the steam, and will not endanger the health, safety, or welfare of the public or of adjoining landowners."  10 V.S.A. § 6086(a)(1)(E).  Applicants asserted several substantial impacts will flow (no pun intended) from Costco's proposed development, including degradation and scoring in the receiving streams (particularly Sunnyside Brook) and will cause further impacts upon streams and wetlands, due to a drawdown of the groundwater.  Their offered experts and their testimony in this regard were not credible.  Costco's proposed improvements, including the improved stormwater protection system and the further protections offered to the recently reclassified Lot 5 wetland, will not only <u>not</u> cause the complained-of endangerments, but will bring positive improvements to the impacts upon area streams.  The flow of water into area streams will be more restricted, thereby reducing the chance of erosion and scouring of the affected stream banks.  The improved stormwater treatment system will improve the quality of what was once stormwater that flows from the Costco site and to area streams, and it will cease the flow of untreated stormwater into the now-protected Lot 5 wetland; that wetland is also the source of water that flows into area streams.  Thus, the "natural condition" of affected streams will not only be maintained, it is likely to improve as a consequence of Costco's proposed improvements.  We therefore conclude that the proposed improvements conform to Act 250 Criterion 1(E).

To the extent that R.L. Vallee wished to also raise by this Question the impacts of chloride usage upon Sunnyside Brook, we note that we have addressed the benefits and lack of detriments that will result from Costco's Chloride Reduction Plan and incorporate that discussion in our determination concerning conformance with Act 250 criterion 1(E).

Criterion 1(G) relates to the protection of significant wetlands.  As noted above, the only identified protected wetland that is either on or possibly impacted by the proposed Costco development is the Class II wetland on Lot 5.  Since we have already determined that Costco's proposed development conforms to the applicable ANR Rules, we conclude that the Costco improvements conform to Act 250 Criterion 1(G).

The last of the "water issues" we consider relates to Act 250 criterion 4 and its directive that a proposed project not cause "unreasonable soil erosion or reduction in the capacity of land to hold water so that a dangerous or unhealthy condition may result."  Even in light of Appellants' assertions on this issue, we conclude that there was no evidence presented, credible or otherwise, that the planned Costco improvements will cause such "dangerous or unhealthy condition[s]."

Appellants asserted throughout the trial that the project will increase erosion in Sunnyside Brook, causing its alteration.  In so doing, Appellants appeared to commit at least two errors: they conflated the impacts of the Costco development as it presently exists with the improvements Costco now proposes; we are only authorized to consider the impacts of the expanded Costco facility.  Second, and perhaps more substantially, Appellants appear to attribute all impacts on Sunnyside Brook to the Costco development and ignore that while Costco's existing improvements have had some impact upon Sunnyside Brook, Costco is just one of a large number of commercial developments that have contributed to adverse impacts upon Sunnyside Brook, including Appellants' own developments.

While it is unfortunate that all area developments have impacted Sunnyside Brook adversely, we are perhaps fortunate that such impacts have not yet been so severe as to cause ANR to list Sunnyside Brook as an impaired water.  More to the point of our legal analysis, we conclude that Costco's proposed improvements will not cause "unreasonable soil erosion or reduction in the capacity of land to hold water so that a dangerous or unhealthy condition may result."  We therefore conclude that the proposed improvements conform to Act 250 Criterion 4.

ii.   **Conformance with Act 250 Criteria 5 and 9(K) (10 V.S.A. § 6086(a)) (i.e. Traffic)**

In nearly all land use proceedings, a developer or applicant always bears the initial burden of producing evidence to support the pending application and its conformance with the applicable regulations or laws and, in nearly all instances, the applicant bears the ultimate burden of persuasion.  Act 250 Criterion 5, which concerns a proposed project's impact upon area traffic, is one of the unique circumstances during which an opponent to a project bears the burden of persuasion with that standard.  10 V.S.A. § 6088(b).  An opponent to a project's

pursuit to positive Findings and Conclusions under Act 250 Criterion 5 faces a further obstacle in its efforts to stall or modify a project by the statutory directive that a proposed project seeking an Act 250 permit may not be denied solely based upon a lack of positive rulings under criterion 5. 10 V.S.A. § 6087(b).

Criterion 5 directs that a proposed project "not cause unreasonable congestion or unsafe conditions" on area highways.[17] 10 V.S.A. § 6086(a)(5). While this directive is brief, it has been the subject of considerable interpretation by our Supreme Court and the former Vermont Environmental Board. We decline to cite here to all the cases cited by Costco and Appellants in their post-trial briefs, although we note that the Court does not seriously dispute the caselaw summaries provided by each party.

Most important is the directive from the both appellate bodies that a Criterion 5 review does not look at the traffic caused by a proposed project in isolation, but rather looks at that estimated additional traffic in relation to the already existing traffic on area highways and at area intersections, determines whether the existing traffic is already congested or unsafe, and determines whether the traffic added by the proposed project will exacerbate the congestion and unsafe conditions on those area highways and intersections. Re Pilgrim Partnership, No. 5W0894-1-EB (Vt. Envtl. Bd. Oct. 4, 1988) aff'd. In re Pilgrim Partnership, 153 Vt. 594, 596 (1989) ("Criterion 5 does not require that proposed development be the principal cause or original source of traffic problems;" the crux of the proper analysis is whether the proposed project will "contribute to the existing traffic problems."). With this directive in mind, we embark on an analysis of the proposed Costco improvements and the traffic it is likely to cause.

Costco acknowledges that its improvements, particularly its creation of a new gasoline sales facility, will cause additional traffic.[18] Even when taken in isolation, the total one-way vehicle trips that the entire proposed expansions will likely cause is no more than 155 one-way vehicle trips during a peak hour of traffic; that amount represents less than 6.5% of the total peak hour trips at the nearby intersection of Roosevelt Highway and I-89 on- and off-ramps.

---

[17] Criterion 5 also protects other transportation avenues, such as "waterways, railways, . . . and airways. 10 V.S.A. § 6086(a)(5). However, since the only evidence presented concerned the proposed expansion's impacts upon area highways and their intersections, we focus solely upon that transportation avenue.

[18] No party disputed Costco's assertion that its proposed building expansion alone would contribute about fifteen one-way vehicle trips during the peak traffic hours.

More relevant to our analysis is that Costco, in acknowledging that its expansion plans will create some new traffic, has pledged to help complete immediate improvements on and near the intersection of Roosevelt Highway and the Upper/Lower Mountain View Drive intersection, as well as work with the Town and VTrans on improving the synchronization of the signals for nearby highway intersections. These improvements will be no small task; the estimate expense exceeds $720,000.00, of which Costco has committed to contribute 20%, based upon the percentage of total traffic its entire facility contributes. The signal improvements will increase the flow of traffic along Roosevelt Highway; the intersection improvements will improve the flow into and out of the access road that serves the Costco and other commercial developments. Those intersection improvements will also increase the capacity of the intersection, such that more vehicles may queue up to turn into and out of Lower Mountain View Drive during particularly congested times.

We conclude that while the proposed Costco improvements will add traffic to area highways and intersections, that traffic, particularly after completion of the mitigation measures that Costco proposes, will not contribute to the existing congestion in the area, even during the peak hours of traffic flow on Roosevelt Highway. Costco has committed to complete those mitigation measures before it occupies and operates the new gasoline station facilities. We therefore conclude that the proposed Costco expansion plans, particularly when conditioned upon the completion of the mitigation measures suggested by Costco, conform to Criterion 5.

As we noted above, the additional corridor improvements, including the DCD intersection improvements, will further alleviate area highway traffic. But the traffic caused by these specific Costco improvements are not of a magnitude to warrant this Court conditioning the future Costco operations on the completion of the improvements proposed by VTrans. The entire Costco facility does contribute significant traffic to these intersections and we are therefore glad to hear that Costco has agreed to contribute to the cost of such improvements. We decline to impose a further condition in this proceeding to require Costco proportional contribution to the DCD improvements, since such a topic or condition is more appropriate for the proceedings currently governing those improvements. We do acknowledge in these

proceedings, however, that Costco has volunteered to make such a contribution, conditioned upon the final approval of their application in these proceedings and the final approval of the VTrans application.

Before leaving this important legal topic, we believe it important to note a distinction between the application currently before us and that which was pending before the Environmental Board and the Supreme Court in Pilgrim Partnership, decisions on which Appellants heavily rely. In Pilgrim, the Board found that the area roadways were "unreasonably congested and unsafe" and already "hazardous," even before the contribution of additional traffic that the project would create. Id. at 595, 596.

While the area roadways in the Costco neighborhood are regularly congested and backed up, we have not found that they were so unsafe and hazardous as the narrow roadways that would serve the Pilgrim development. The latter roadways were so unsafe and hazardous that the mere addition of 30 vehicle trips that the Pilgrim project would contribute were found to potentially exacerbate the unsafe and hazardous conditions. We make no such findings here. In fact, we do not recall any fact or expert witness during our trial using such terms to credibly describe the roadways near Costco. Here both the existing traffic problems and the potential impact the project poses are not nearly at the level present in Pilgrim.

Lastly, we consider whether Costco's proposed project will "unnecessarily or unreasonably endanger [the area highways[19]] . . . or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to [such highways]." 10 V.S.A. § 6286(a)(9)(K).

It is important not to conflate the analysis under Criteria 5 and 9(K). First, unlike under Criterion 5, an applicant carries the full burden of proof under Criterion 9(K). Second, the former Environmental Board has characterized a Criterion 9(K) review as focusing on whether a proposed project places a "public investment," such as a public highway, in "material jeopardy" or "material interference." Re: Swain Development Corp. and Philip Mans, No. 3W0445-2-EB

---

[19] Act 250 criterion 9(K) protects other public investments from unnecessary or unreasonable endangerments, but the only public investment identified by the parties here that the Costco improvements could have such an impact upon was the area highways; we therefore limit our analysis to area highways and the impact upon them.

at 33–4 (Vt. Envtl. Bd. Aug. 10, 1990) (also suggesting that such a standard denotes a higher threshold for project conformance than Criterion 5).

Even with this higher standard, we conclude that the proposed Costco expansion conforms to Criterion 9(K). As noted above, we have found that the traffic caused by the proposed expansion, particularly when mitigated by the signalization and intersection improvements Costco proposed, will not cause interference for the public highways or place the public investment in them in jeopardy. In fact, the overall plans by Costco, including its contributions to the costs of VTrans' proposed highway corridor and DCD intersection improvements, will actually enhance and reinforce the public investments in these area highways. We hope that these efforts by Costco will encourage the owners of other nearby commercial developments, including Appellants, to also contribute to the area highways that represent significant and important public investments.

## III.    Stormwater Discharge Appeal (Docket No. 75-6-12 Vtec)

### i.    Question 11:  Adequacy of Groundwater recharge

This Question has more depth to its narrative, at least in the form as R.L. Vallee first presented when it filed its Amended and Consolidated Statement of Questions on May 30, 2014. As amended, Question 11 asks whether the Project reduces the capability of the current stormwater system to provide treatment and control of runoff from existing impervious surfaces. However, during the Court's discussion with the parties, after the close of evidence on the last day of trial, R.L. Vallee's legal counsel represented that all that remained on Question 11 was its challenge to whether Costco's proposed stormwater plans would provide adequate recharge of the area groundwater.

Water stored underground arrives from many sources, including direct contributions by stormwater that flows underground and water that leaches underground through surface areas, wetlands, streams, and other water bodies. As noted above, we heard, but ultimately did not find credible due to its lack of reliable factual foundation, Appellants' assertion that Costco's proposed plans would cause a "cone of dispersion" below ground that would lower the groundwater table; we also did not find credible that Costco's plan to divert untreated stormwater away from the now-protected Lot 5 wetland would negatively impact the

surrounding water table. In short, we only found support for Costco's representation that the area groundwater table would <u>not</u> be impacted by its expansion or stormwater treatment plans. ANR concurred with Costco's representation; we also found ANR's representations credible in this point, particularly given the experience and expertise of ANR employees and experts. We therefore conclude that R.L. Vallee's revised Question 11 should be answered in the affirmative: Costco's proposed improvements provide for adequate recharge of the area groundwater.

ii. **Question 12: Does the Project negatively impact adjacent headwater wetlands?**

As indicated above, the District Commission's prior finding that no headwaters are located within or impacted upon by the Costco development was not refuted during our trial and we concluded that the proposed Costco improvements will not cause a reduction of the quality of the ground or surface waters flowing through these important resources. We restate here that the project as proposed will not negatively impact adjacent headwater wetlands. We conclude that, given the credible evidence presented, Question 12 does not warrant further review.

iii. **Question 13: "Does the Project meet the Treatment Requirements of the Stormwater Management Rule[s] and the Vermont Stormwater Management Manual ("VSMM)?"**

We attempted to detail the characteristics and conditions of Costco's existing stormwater treatment system beginning at our Finding No. 62 and continuing through our assessment of the proposed new stormwater treatment system that concludes with Finding No. 101. As noted therein, a comparison of the existing and future systems is somewhat unfair, for at least the following two reasons: first, the existing system was reviewed and permitted under the then-existing Stormwater Rules, first enacted in 1987, while the proposed system is evaluated under the existing, more stringent Rules, adopted in 2002; and second, the existing system was not required to respect or protect the wetland on Lot 5, since it was then classified as unprotected, and as a consequence of that non-protection, untreated stormwater was allowed to flow into and through that wetland. Conversely, the proposed treatment system respects and protected the wetland on Lot 5, since it is now regarded as a Class II (protected) wetland.

Costco, through its experts, provided credible and mostly uncontradicted evidence of the proposed new stormwater treatment system's conformance with both the Stormwater Management Rules and the VSMM. The latter provides standards and guidelines for the design of a properly-conforming stormwater treatment system. Costco's experts provided credible evidence of how they initially used the VSMM to plan the treatment system, and then worked with ANR officials to review and revise to the proposed system to ensure fully compliance with the Rules or the VSMM. Ultimately, Costco presented a finalized treatment plan that ANR supported through independent testimony at our trial.

Appellants offered testimony and other evidence that did not contradict Costco's and ANR's representations, but rather offered suggestions of what else Costco's treatment system should include. One such suggestion was a characteristic that, if adopted, would have led to the Costco treatment system being in direct contradiction of the existing Rules: allowing untreated stormwater to continue to flow into what is now a Class II wetland. Had Costco adopted Appellants' suggestion in this regard, we are uncertain that the resulting treatment system could have been found to conform; as it is now proposed, we conclude that the proposed stormwater treatment system conforms to both the Rules and the VSMM.

### iv. Question 14: Will the Project contribute additional pollutants, including chloride?

When compared to the existing project site, the credible evidence led us to conclude that the improved site will not add additional pollutants to the receiving waters of this watershed. R.L. Vallee chose to specifically list chloride in its Question 14 and we assume that focus was purposeful, since no credible evidence was presented at trial of other specific pollutants being added to the area waterways by the proposed project. Chloride is most often introduced to this highly-developed area by the public and private practices of using chloride and its derivations to de-ice and clear roadways and parking lots in the winter time. The State does not prohibit the use of chloride on roadways and parking lots and ANR does not regulate or limit its use. Perhaps as a consequence, or perhaps for no specified or organized reason, excessive chloride is applied, sometimes because public and private de-icing efforts overlap. Whatever the reason, so much chloride has been deposited and made its way into area waterways that ANR has chosen to list Sunnyside Brook as a "stressed" waterway. ANR officials

clarified at trial that a "stressed" water does not equate to an "impaired" water, which is a designation that affords increased protections under applicable Vermont laws and regulations.

If excessive amounts of chloride were allowed to be continually deposited into Sunnyside Brook, and especially if other pollutants were added as well, Sunnyside Brook may eventually become an impaired waterway. While it has not yet become an impaired water, we commend Costco's efforts to diminish that possibility by implementing a Chloride Reduction Plan. Costco's effort is likely to reduce the duplication of chloride use and reduce its overall transmission into Sunnyside Brook. Costco's efforts may not bear significant immediate returns, since its contribution of chloride to the area roads and waterways represents a small fraction of the total annual chloride used by public and private entities. However, to the specific legal issue posed by this Question 14, we answer that no, the credible evidence does not support an assertion that the proposed project, if constructed and operated as designed and permitted, will contribute additional pollutants to the area waterways.

### v. Question 15: What conditions and other regulatory protections should be applied?

We conclude that the credible evidence and applicable laws and regulations do not warrant attaching additional conditions to these application approvals, other than those conditions not appealed, those conditions created by this Merits Decision, and those conditions that were established by the state and municipal panels below and that survived these appeals.

## IV. Stormwater Construction Permit Appeal (Docket No. 181-12-11 Vtec)

As noted above, R.L. Vallee represented during the trial that it no longer wished to prosecute this appeal and it repeated its decision during the parties' discussion with the Court after the evidentiary hearing was closed on July 2, 2014. However, in their subsequent post-trial filings, most of the parties listed this Docket in their caption for those pleadings, although the parties made little or no reference to this appeal in the text of their filings. Nonetheless, we note here that R.L. Vallee advised during the Court's conversation with the parties after completion of the evidentiary hearing that it no longer wished to pursue the issues raised in its Questions 16 and 17. Based upon that representation, we **DISMISS** those Questions and in the Stormwater Construction Permit Appeal, Docket No. 181-12-11 Vtec, we do hereby **AFFIRM** the Authorization under Vermont General Construction Permit #3-9020 (Notice of Intent No. 4114-

-50-

9020.2) dated December 13, 2011, subject to any revised site plans and designs admitted at our trial. We **REMAND** these proceedings to the Department of Environmental Conservation, Water Quality Division of the Agency of Natural Resources, solely for the limited purpose of re-issuing that Authorization once these proceedings become final, so that the revised plans and designs may be incorporated and its expiration date will be stated as two years after the effective date, pursuant to the applicable Stormwater Rules.

## Conclusion

Based upon the Factual Findings and Legal Conclusions above, as well as the parties' representations relative to Questions and appeals withdrawn, we do hereby Order as follows:

A. In the Stormwater Discharge Appeal, Docket No. 75-6-12 Vtec, we do hereby **AFFIRM** the Authorization to Discharge under General Permit #3-9015 (Permit No. 4114-9015.2) dated May 15, 2012, subject to any revised site plans and designs presented at our trial. We do hereby **REMAND** these proceedings to the Department of Environmental Conservation of the Agency of Natural Resources, solely for the limited purpose of re-issuing that Authorization once these proceedings become final, so that the revised plans and designs may be incorporated and its expiration date will be stated as ten years after the effective date, pursuant to the applicable Stormwater Rules.

B. In the Final Plat & Site Plan Amendment Appeal, Docket No. 104-8-12 Vtec, we do hereby **APPROVE** Costco's final plat and site plan amendment application and do hereby remand this matter to the Town of Colchester Planning Office for the limited purpose of issuing a permit in conformance with this Decision, subject to the revised plans admitted at our trial, and incorporating the terms and conditions not appealed from in the Decision and Order of the Town of Colchester Development Review Board issued on July 25, 2012.

C. In the Act 250 Appeal, Docket No. 41-4-13 Vtec, we do hereby **APPROVE** Costco's application for an amended Act 250 permit, subject to the revised plans that were admitted at our trial, subject to the final plat and site plan amendment application and incorporating the terms and conditions not appealed from in the Findings of fact, Conclusions of Law, Order and Permit (LUP #4C0288-19C) issued on January 24, 2103 by the District 4 Environmental Commission.

D. In the Wetlands Reclassification Appeal, Docket No. 132-10-13 Vtec, we do hereby **CONCLUDE** that the wetland on Lot 5 must be reclassified as a protected Class II wetland and that the important functions and values it serves require that the wetland be protected by a buffer of no less than fifty feet. In all other respects, we do hereby **AFFIRM** the determination on reclassification issued on September 3, 2013 by the Vermont Agency of Natural resources, Department of Environmental Conservation.

E. In the Wetland Permit Appeal (Permit No. #2013-189), Docket No. 59-5-14 Vtec, we do hereby **AFFIRM** the issuance on March 7, 2014 by the Commissioner of the Department

of Environmental Conservation, Agency of Natural Resources of the Individual Wetland Permit (Permit No. 2013-189), together with all the terms and conditions stated therein and subject to the revised plans and designs admitted at our trial.

Within thirty (30) days of this Decision becoming final, Costco Wholesale Corporation shall provide all State and municipal panels appealed from complete copies of all site plans and designs admitted into evidence during our trial, together with a copy of the final Decision concerning these appeals, so that each of those panels may have a complete record.

This completes the current proceedings before this Court. A Judgment Order accompanies this Merits Decision.

Electronically signed on August 27, 2015 in Brattleboro, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division